IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CINDY A. MUDGETT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 09-254 |
| | ) |
| UNIVERSITY OF PITTSBURGH | ) |
| MEDICAL CENTER, UNIVERSITY | ) |
| OF PITTSBURGH PHYSICIANS, | ) |
| and UNIVERSITY OF | ) |
| PITTSBURGH PHYSICIANS | ) |
| DEPARTMENT OF UROLOGY, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION**

Pending before the Court is a motion for summary judgment filed by Defendants University of Pittsburgh Medical Center, University of Pittsburgh Physicians, and University of Pittsburgh Physicians Department of Urology (collectively, "UPMC"), Doc. No. 26. For the reasons discussed below, the Motion is granted and judgment is entered in favor of Defendants.

**I.    BACKGROUND**

   A.    Factual Background[1]

Plaintiff Cindy Mudgett graduated from Ohio Valley School of Nursing in 1975 with a three-year degree and subsequently became certified as a registered nurse. For nearly twenty years, she maintained her license as an RN, although she took some time away

---

[1] The facts in this section are undisputed. See, primarily, Defendants' Concise Statement of Material Facts, Doc. No. 33, and Plaintiff's Response thereto, Doc. No. 48.

from the job to raise a family. On June 30, 2004, Ms. Mudgett began working for the Urology Department of the University of Pittsburgh Medical Center, assigned to the Adult Urology Clinic ("the Clinic") in Pittsburgh, Pennsylvania. The Clinic treats patients with cancers of the urinary, prostate, and adrenal systems as well as related conditions. The Clinic staff at the time consisted of five to eight doctors, two receptionists, five secretaries, a licensed practical nurse ("LPN"), and Ms. Mudgett.

Plaintiff's title when she was hired was "Staff Nurse" which was changed shortly thereafter to "Clinical Coordinator." Her beginning salary was $55,036.80, an amount considerably greater than the salaries of other Clinic staff. When she was hired, Ms. Mudgett received a written job description and was informed that she would be considered a salaried employee not entitled to overtime compensation, regardless of the number of hours she worked each pay-period.

During her tenure at the Clinic, Ms. Mudgett performed a variety of duties including assisting physicians during medical procedures, independently performing laboratory tests, preparing patients for testing and procedures, maintaining medical equipment, and discussing medical issues and medications with patients both in person and on the telephone. She also made recommendations to improve patient treatment, handled complaints at the Clinic, maintained patient records, and ensured compliance with federal and

state regulatory standards as well as UPMC policies and procedures. Ms. Mudgett acted as first-line supervisor of two office employees, several medical assistants, and one or more LPNs, depending on the amount of work at the Clinic. Together with Roxann Booser, her immediate supervisor, Plaintiff made recommendations regarding merit pay increases for the clinical staff, assisted in interviews of potential employees, and made suggestions with regard to additional clinic staffing. She conducted performance evaluations of clinical staff members and recommended discipline as necessary.

For reasons unrelated to the issues in this case, Plaintiff's employment at the Clinic was terminated on September 9, 2008.

B.  Procedural Background

On February 26, 2009, Ms. Mudgett filed suit in this Court, contending that despite her job description, she had been entitled to overtime compensation under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA.") That is, UPMC willfully failed to comply with Sections 207(a) and 215(a)(2) of the FLSA inasmuch as she had worked approximately 2,700 hours between June 30, 2004, and September 8, 2008, time for which she had not been compensated. Second, Defendants violated Sections 211(c) and 215(a)(5) of the FLSA by failing to make, keep, and preserve accurate records of an employee's daily and weekly hours worked, wages, and other conditions and practices of employment. These same omissions and failures also constitute a violation of the

Pennsylvania Minimum Wage Act, 43 P.S. § 333.101 et seq. ("MWA"), in particular 43 P.S. § 113.104(c). Defendants do not dispute the fact that they are subject to both the FLSA and the MWA.

Following unsuccessful mediation and extensive discovery, UPMC filed the now-pending motion for summary judgment. Plaintiff has filed a response thereto and the matter has been fully briefed.

## II. JURISDICTION AND VENUE

This Court has subject matter jurisdiction over Plaintiff's primary claims pursuant to the Fair Labor Standards Act, specifically 29 U.S.C. § 216(b), and supplemental jurisdiction over her claims for violation of the Pennsylvania Minimum Wage Act pursuant to 28 U.S.C. § 1367(a). Venue is appropriate in this district under 28 U.S.C. § 1391(a)(2) or (3).

## III. STANDARD OF REVIEW

A court may grant summary judgment if the party so moving can show "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Sollon v. Ohio Cas. Ins. Co., 396 F. Supp.2d 560, 568 (W.D. Pa. 2005). If a reasonable jury could return a verdict for the non-movant, the dispute is genuine and if, under substantive law, the dispute would affect the outcome of the suit, it is material. A factual dispute between the parties that is both genuine and material will defeat a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986).

The movant must show that if the pleadings, depositions and other evidentiary material were admissible at trial, the other party could not carry its burden of proof based on that evidence and a reasonable jury would thus decide all genuine material disputes in the movant's favor. Celotex Corp. v. Catrett, 477 U.S. 317, 318 (1986).

Once the movant has demonstrated that there are no genuine issues of material fact, the burden shifts to the non-moving party to "make a showing sufficient to establish the existence of every element essential to his case, based on the affidavits or by depositions and admissions on file." Celotex, id. at 322-323; Sollon, id.; Fed.R.Civ.P. 56(e). The sum of the affirmative evidence to be presented by the non-moving party must be such that a reasonable jury could find in its favor, and it cannot simply reiterate unsupported assertions, conclusory allegations, or mere suspicious beliefs. Liberty Lobby, id. at 250-252; Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995).

In considering a motion for summary judgment, the court must view all evidence in the light most favorable to the non-movant, accept the non-movant's version of the facts as true, and draw all reasonable inferences and resolve any conflicts in its favor. Sollon, id., *citing* Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## IV. ANALYSIS

Defendants argue that Plaintiff's claims must fail because the evidence shows unequivocally that Ms. Mudgett was exempt from the overtime requirements of the FLSA and MWA under the executive and/or professional exemptions. However, if the Court should decide not to enter summary judgment on this basis, the method for calculating the alleged unpaid overtime should be based on the fluctuating workweek method. (Memorandum of Law in Support of Defendants' Motion for Summary Judgment, Doc. No. 27, at 1-2.) Because we find the evidence shows Ms. Mudgett's duties were undoubtedly professional, we need not consider whether she was also exempt under the executive exclusion nor the question of how overtime pay should be calculated.

### A. Relevant Law

Among other provisions of the FLSA related to wages, employees must receive overtime pay for all hours worked in excess of forty hours per workweek; the overtime pay must be at least one and one-half times the "regular rate" of pay. See 29 U.S.C. § 207(a)(1).[2] Three exceptions apply to this general rule; that is, individuals employed "in a bona fide executive, administrative,

---

[2] "Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1).

or professional capacity" are exempt from this provision and need not receive overtime wages. 29 U.S.C. § 213(a)(1). The same requirements and exemptions apply under the Pennsylvania MWA. *Compare* 29 U.S.C. § 213(a)(1) and 43 P.S. § 333.105(a)(5).[3] Exemptions from the overtime provisions of the FLSA[4] are to be construed narrowly against the employer, who bears the burden of proof that a given employee falls within the scope of an overtime exemption. *See* <u>Madison v. Resources for Human Dev., Inc.</u>, 233 F.3d 175, 183 (3d Cir. 2000), *citing* <u>Mitchell v. Kentucky Fin. Co.</u>, 359 U.S. 290, 295 (1959); and <u>Davis v. Mountaire Farms, Inc.</u>, 453 F.3d 554, 556 (3d Cir. 2006).

Under the FLSA, a person is employed in a bona fide professional capacity if two criteria are met. First, the person must be "[c]ompensated on a salary or fee basis at a rate of not less than $455 per week." 29 C.F.R. § 541.300. The salary test is satisfied if the employee

> regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of [her] compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed.

29 C.F.R. § 541.602(a).

---

[3] The statute provides in relevant part: "Employment in the following classifications shall be exempt from both the minimum wage and overtime provisions of this act:. . . .(5) In a bona fide executive, administrative, or professional capacity." 43 P.S. § 333.105(a).

[4] Because the relevant provisions of the FLSA and the MWA are identical, we refer and cite only to FLSA requirements hereafter.

According to UPMC records and Plaintiff's deposition testimony, Ms. Mudgett's salary when she began working at the Clinic was $55,036.80, an average of approximately $1,058 per week. (See Appendix of Record Materials in Support of Defendants' Motion for Summary Judgment ("Defs.' App."), Doc. No. 31, Tab F, Declaration of Wendy L. Thunell, ¶ 2, and Defs.' App., Doc. No. 28, Tab A, Excerpts from Deposition of Cindy A. Mudgett ("Mudgett Depo."), at 33.) The evidence also shows that her salary was substantially greater than those of other Clinic employees at the time. (Defs.' App., Doc. No. 31, Tab F, Declaration of Gary DuJordan.) Ms. Mudgett testified that with one exception during her five years of employment, she received the same amount of pay each pay period regardless of the number of hours she worked. (Defs.' App., Doc. No. 28, Mudgett Depo. at 36.) Thus there is no question the first prong of the learned profession exemption is met and Plaintiff does not dispute this conclusion. (Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment, Doc. No. 37, "Plf.'s Brief," at 6.)

The second prong of the professional exemption test requires the Court to determine the employee's "primary duties." See 29 C.F.R. § 541.301(a). This conjunctive test asks if

> the employee performs "work requiring advanced knowledge;"
>
> the advanced knowledge is "in a field of science or learning;" and
>
> the knowledge is "customarily acquired by a prolonged course

of specialized intellectual instruction."

29 C.F.R. § 541.301(a).

As the regulations further explain, the phrase "work requiring advanced knowledge"

> means work which is predominantly intellectual in character,. . .requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work. An employee who performs work requiring advanced knowledge generally uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances.

29 C.F.R. § 531.301(b).

The phrase "field of science or learning" refers to

> the traditional professions of law, medicine,. . . teaching, various types of physical, chemical and biological sciences, pharmacy and other similar occupations that have a recognized professional status as distinguished from the mechanical arts or skilled trades where in some instances the knowledge is of a fairly advanced type, but is not in a field of science or learning.

29 C.F.R. § 531.301(c).

Finally, the phrase "customarily acquired by a prolonged course of specialized intellectual instruction"

> restricts the exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession. The best prima facie evidence that an employee meets this requirement is possession of the appropriate academic degree. . . . However, the learned professional exemption is not available for occupations that customarily may be performed with only the general knowledge acquired by an academic degree in any field, with knowledge acquired through an apprenticeship, or with training in the performance of routine mental, manual, mechanical or physical processes.

9

29 C.F.R. § 531.301(d).

Most relevant to the motion for summary judgment in this case is the fact that registered nurses are explicitly identified, along with other medical occupations such as registered or certified medical technologists, dental hygienists, and physicians assistants, as positions recognized as falling under the "learned professions" exemption. The regulations state:

> Registered nurses who are registered by the appropriate State examining board generally meet the duties requirements for the learned professional exemption. Licensed practical nurses and other similar health care employees, however, generally do not qualify as exempt learned professionals because possession of a specialized advanced academic degree is not a standard prerequisite for entry into such occupations.

29 C.F.R. § 541.301(e)(2).

### B. Ms. Mudgett's Qualifications and Duties

As noted above, Ms. Mudgett graduated from a full-time, three-year nursing program at the Ohio Valley Hospital School of Nursing in 1975. (Defs.' App., Doc. No. 28, Mudgett Depo. at 8.) She subsequently took and passed the Pennsylvania examining board examinations to become a professional registered nurse (id. at 9) and worked as a registered nurse for several years at a number of hospitals before applying for the position of Clinical Coordinator at the UPMC Adult Urology Clinic (id. at 13.)

Although a job description is not dispositive of the question

regarding professional status,[5] we begin with determining the qualifications, duties and responsibilities set out by the employer. See Pignataro v. Port Auth., 593 F.3d 265, 269, n.6 (3d Cir. 2010) (to determine if the plaintiffs' primary duties required advanced knowledge acquired by prolonged specialized instruction and study, the court needed to first ascertain the qualifications and certifications of the position.) The Educational/Knowledge and Licensure/Certification requirements for Ms. Mudgett's position indicated that

> [t]he Nurse Coordinator must have satisfactorily completed formal training in an accredited professional school of nursing. A minimum of three years nursing experience and/or one year critical care is preferred. [A Bachelor of Science in Nursing] degree preferred. The nurse must attend continuing education programs. The Nurse Coordinator must have licensure in the State of Pennsylvania or [be] eligible for state board licensure.

(Defs.' App., Doc. No. 29, job description dated September 12, 2005, "Job Descript.")

The job description also includes the Nurse Coordinator's primary duties, i.e., the "Job Purpose:"

> . . . the Nurse Coordinator is responsible for the nursing care of urology patients. This includes gathering history and physicals, performing various urological procedures, and overseeing the overall flow of the patients during clinic. The nurse coordinator will manage/return patient calls where appropriate or triage to the appropriate physician.

---

[5] "A job title alone is insufficient to establish the exempt status of an employee. The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part." 29 C.F.R. § 541.2.

11

(Job. Descript.)

Among the Clinical Coordinator's responsibilities, the following pertain to her nursing activities:

> Manages difficult or emotional [patient] situations and responses promptly to [patient] needs;
>
> Assess[es] health history information and medication history for appropriateness;
>
> Demonstrates clinical competency in providing care to all patients. Appropriately monitors patients based on medical status and responds effectively to emergencies or changes in patient condition. Maintains complete and accurate documentation. . . for patient assessments, charts, nurses notes, drug records, etc.;
>
> Seeks increased responsibilities - Exhibits sound and accurate judgment. Makes decisions based on situational assessment. Undertakes self-development activities.

(Job Descript.)

The Clinical Coordinator job description thus not only requires the incumbent to have an advanced "appropriate degree" in "a field of science" and registration "by the appropriate State examining board," but the duties and skills of the position are those which one may safely assume require the "consistent exercise of discretion and judgment" and the ability to "analyze, interpret or make deductions from varying facts or circumstances." These are factors consistent with the FLSA regulations describing a professional position exempt from overtime provisions.

We next turn to the question of determining the "principal, main, major or most important duty" Ms. Mudgett performed. To qualify for the professional exemption, the primary duty must be

the performance of exempt work, based on all the facts of the case, with "major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). Factors the court should consider

> include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700(a).

"Determining the duties encompassed by an employee's position is a question of fact; determining the appropriate FLSA classification is a question of law." Roe-Midgett v. CC Servs., 512 F.3d 865, 869 (7th Cir. 2008), citing Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714 (1986).

In her brief in opposition to the motion for summary judgment, Plaintiff denies that her primary duties consisted of "work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction." To the contrary, she argues, her duties were "varied and menial," including tasks such as "providing medical care, cleaning, and preparing office equipment." While she did perform "some managerial type duties," one of her main job responsibilities was "patient care and education." She took and analyzed urine specimens, prepped patients for procedures such as vasectomies, prostate biopsies, and cystoscopies (e.g., hooked up

13

equipment, administered Betadine, removed and cleaned the cystoscope used by the doctor.) She sent specimens from bladder biopsies to the lab. She educated patients on procedures to be performed and "spent a lot of time talking directly with patients," teaching them what to do after the procedure and trying to keep them from being nervous. Ms. Mudgett consulted with patients in person and by telephone, clearly stating at her deposition "that she answered calls from patients all day long and made assessments accordingly based on her nursing knowledge." She was responsible for "mixing chemotherapy" and administering the correct dosage to patients. In sum, according to Ms. Mudgett, "the record clearly illustrates that [her] regular job functions were, in fact, primarily custodial duties[,] some nursing duties and maintaining medical equipment." (Plf.'s Brief at 6-8.)

Plaintiff further argues that there are genuine issues of material fact with regard to whether her primary duty consisted of exempt work. She contends that "most of the work she performed at the clinic was the unspecialized work of an LPN which does not require the advanced knowledge to rise to the level of professional exemption." (Plf.'s Brief at 9.)

Although the regulations acknowledge that the amount of time spent performing exempt, as compared to non-exempt, work may be "a useful guide" in this determination, it is not the only factor. In general, "employees who spend more than 50 percent of their time

14

performing exempt work will generally satisfy the primary duty requirement," but nothing in the regulations requires that the employee do so. 29 C.F.R. § 541.700(b). Instead, the court is to determine other factors which may support the conclusion that the employee meets the "primary duty" requirement, for example, the amount of close supervision the employee receives and the relative salaries of the professional and the employees she supervises. Id.

In an effort to make her duties comparable to those of a licensed practical nurse, Ms. Mudgett minimizes the amount and complexity of the decision-making required by her position. However, she was clearly regarded by her co-workers as possessing both more skills than an LPN and more responsibility. For instance, Dr. Ronald Benoit testified that a significant part of Ms. Mudgett's duties was to interact directly with patients. If a patient had a typical question that had arisen many times and the answer was simple, she could call the patient and let the doctor know later what had been done. If it was more complex, she would tell the physician and "move on from there." (Defs.' App., Doc. No. 30, Tab B, Excerpts from Deposition of Dr. Ronald Benoit, at 25.) Ms. Mudgett was in charge of creating protocols, i.e., a description of a physician's preferred way of performing a medical procedure, and training the clinic staff how to do that procedure accordingly. (Id. at 17.) Dr. Benoit also testified that if physicians were not available when a patient called in with a

15

problem, "the secretaries could go right to Cindy . . . And Cindy could take care of the problem or talk to the physician about the problem." (Id. at 25.)

Another clinic staff member, Amy Ardolino, testified that "Cindy is an RN and is able to treat a patient." (Defs.' App., Doc. No. 30, Tab C, Excerpts from Deposition of Amy Ardolino, at 48.) She "was given authority from different physicians to treat their patients." (Id.) While she did perform a number of duties shared by the LPNs and medical assistants such as directing patients to an examination room, taking urine and blood samples, assisting physicians with various procedures, and cleaning the examination room and equipment afterwards, Ms. Mudgett was the only Clinic employee who triaged patients,[6] gave Lupron injections,[7] assisted the physicians with TUNA[8] procedures, and ordered all drugs for the Clinic. (Id. at 64, 70-71.) Under UPMC policy after Ms. Mudgett was hired, a registered nurse had to give or mix chemotherapy treatments and do the actual installation. (Id. at

---

[6] The Clinic staff seem to use the phrase "triage patients" to mean identifying the order in which a patient would be seen by a physician or have his/her telephone call answered, based on a medical evaluation of the patient's condition.

[7] Lupron is a brand name of leuprolide, a hormone used to treat the symptoms of prostate cancer. See www.drugs.com/lupron, last visited May 3, 2010.

[8] It is unclear from the record what the acronym TUNA refers to. At the time of Ms. Androlino's deposition, the procedure was no longer being done at the Clinic. According to www.emedicine.medscape.com, TUNA stands for transurethral needle ablation, a procedure used to treat benign enlargement of the prostate.

73.) Ms. Androlino confirmed Dr. Benoit's testimony that Ms. Mudgett could "call and treat the patient basically," then inform the physician what her recommendation had been. (Id., 73-74.)

Finally, Plaintiff's own deposition testimony supports the conclusion that she performed tasks beyond the expertise and authority of an LPN. She could perform intravenous therapy (although this was not done at the Urology Clinic at the time), chemotherapy, and nursing diagnosis of a patient, activities which were not done by LPNs and required the use of "nursing judgment." (Defs.' App., Doc. No. 28, Mudgett Depo. at 10, 55-56.) After procedures, she would talk with the patients and "[m]ostly, I would teach them what they had to do afterwards. . . . I always spent time with the patients when I was in there." In response to a follow-up question, Ms. Mudgett acknowledged that such conversations required her to use her nursing knowledge. (Id. at 54.) Similarly, she used her nursing judgment when deciding whether a patient needed to be seen by a physician the same day or if an appointment could be postponed. (Id. at 58-59.) As for assessing patients' treatments,

> If it was something I knew, I would tell the patient, well, we've seen this before. We'll get back to you. If I had experience, if I knew what it was, I had things I was allowed to tell patients. After I was there a year, [the physicians] started telling me, well, you can tell them this. If they are having bleeding, tell them this. . . . I had to make a lot of calls. After [the doctors] left, they would leave me the messages to call patients.

(Defs.' App., Doc. No. 28, Mudgett Depo. at 55.)

It is clear from this testimony that both the doctors for whom

17

she worked and Ms. Mudgett herself believed that her responsibilities with regard to patient care involved "the consistent exercise of discretion and judgment" as well as using her advanced nursing knowledge "to analyze, interpret or make deductions from varying facts or circumstances." She assessed the needs of patients, recommended individual treatment, either to the patient directly when she was familiar with the symptoms and condition, or with the concurrence of a physician, and frequently acted without direct supervision when interacting with patients.

As to the requirement for specialized education, Ms. Mudgett attempts to downplay this aspect of her job by relying on the fact that when she was first employed at the Clinic, she learned much of the routine for her job from a licensed practical nurse. (Plf.'s Brief at 9.) The fact that the details of procedures and routines of a particular working environment such as a urology clinic may need to be learned on the job, just as an attorney may need to learn a new field of law when she changes from one firm to another, does not make superfluous the underlying knowledge and skills which initially qualified the person for the position and which she continues to apply in that new work environment.

In opposition to the motion for summary judgment, Plaintiff provides "very detailed time logs" for the period 2004 through 2008, showing that she worked a total of 2,698 hours of overtime. (Plaintiff's Appendix, Doc. Nos. 39-43.) Having worked those hours

18

does not automatically entitle her to overtime pay if one of the FLSA exemptions applies, thus the mere existence of those records does not create a genuine issue of material fact in this case. Plaintiff also states under oath that she "believed at all relevant times that she was to work 40 hours per week." (Affidavit in Opposition to Defendants' Motion for Summary Judgment, Doc. No. 38, "Affidavit," ¶ 5.) Such a belief is unreasonable in light of her admission that not less than a month after she began working for the Clinic in June 2004, she was informed that she was salaried and exempt from overtime provisions, regardless of the number of hours she worked. (Defs.' App., Doc. No. 28, Mudgett Depo. at 36.) Similarly, her statement that over 80% of her work day was spent performing "non-managerial duties" (Affidavit, ¶10) may be factually correct, but appears to be no more than an attempt to evade the obvious conclusion, based on overwhelming evidence, that she fell within the professional exemption, also excluding her from the right to mandatory overtime pay under the FLSA and MWA. See Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 161 (3d Cir. 2009), noting that "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment. Instead, the affiant must set forth specific facts that reveal a genuine issue of material fact." (Internal quotation omitted.)

The facts of this case are similar to those of SanSoucie v. Reprod. Assocs. of Del., P.A., CA No. 04-861, 2005 U.S. Dist. LEXIS

8165 (D. Del. May 4, 2005), where the plaintiff was hired as an "Assistant Lab Manager/Embryologist;" had several years of advanced academic training, numerous certifications, and 26 years of work experience in related fields; and held herself out as an embryologist. When subsequently seeking overtime benefits, she denied her professional status. The court concluded that because the plaintiff had failed to produce any evidence to support her contention that she did not fall within the professional exemption, while the defendant had presented documentary evidence to establish that Plaintiff's primary duties were professional, there was no material issue of fact that SanSoucie was exempt from the FLSA and Delaware state overtime provisions.

In a similar vein, Plaintiff here has failed to come forward with any persuasive evidence that UPMC violated the FLSA or the Pennsylvania MWA by classifying her duties as professional or to refute Defendants' contention that her primary duties involved the application of special professional expertise. Thus, we conclude Ms. Mudgett was exempt from the mandatory overtime provisions of the statutes and summary judgment is granted in favor of Defendants. An appropriate order follows.

May __6__, 2010                              _William L. Standish_
                                             William L. Standish
                                             United States District Judge